**AFFIRM; and Opinion Filed January 23, 2023**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-21-00882-CV

## IN THE INTEREST OF N.W.C., A MINOR CHILD

### On Appeal from the 330th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DF-16-01933

## MEMORANDUM OPINION

Before Justices Pedersen, III, Goldstein, and Smith
Opinion by Justice Smith

This is an appeal from an order in a suit to modify the parent-child relationship under Texas Family Code chapter 156. In three issues, Mother appeals the order's restrictions on geographic residency and international travel and the trial court's decision to exclude the testimony of Mother's expert witness. We affirm the trial court's order.

## Background

Mother and Father divorced in November 2016. The divorce decree gave Mother the exclusive right to designate the primary residence of N.W.C., their two-year-old son, within Dallas County, Collin County, or Southlake Independent School District. When N.W.C. turned three, the decree gave Father the right of possession

on the second, fourth, and fifth weekends of each month and Thursday evenings during the school year. Father also had the right of possession for spring break in even-numbered years and extended possession in the summer. Mother had the right of possession at all other undesignated times. Mother also had the independent right to make decisions concerning N.W.C.'s education after consulting with Father, but, if unable to agree, they were to attempt to resolve the disagreement through a parenting facilitator. The decree also required them to provide written notice to each other if they intended to travel with N.W.C. outside the United States during their period of possession.

In July 2017, Mother married Stepfather, who lived and worked in Oklahoma City, Oklahoma. Thereafter, Mother and N.W.C. spent as much time as possible with Stepfather in Oklahoma.

In December 2017, Mother filed a petition to modify the parent-child relationship. The petition did not identify the modifications Mother sought. Instead, it indicated that the parties, pursuant to the divorce decree, were to first mediate issues regarding modification to the conservatorship of, possession of, or access to N.W.C.

In July 2018, Father filed a counter-petition. Believing Mother had relocated her primary residence outside the geographic area set forth in the divorce decree, Father requested the right to designate N.W.C.'s primary residence within the already-existing geographic residency area.

Thereafter, Mother advised Father that she wanted to permanently relocate with N.W.C. to Oklahoma City. She and Father were unable to reach an agreement and, in October 2018, Mother amended her petition, seeking to remove the geographical residency restriction and be named the conservator with the exclusive right to make educational decisions for N.W.C. In a November 2020 supplement to his counter-petition, Father requested to be appointed the conservator with the exclusive right to make educational decisions for N.W.C. with the condition that the trial court "confirm that the parties must agree on education decisions" and, "in the absence of agreement . . . [, N.W.C.] shall continue in his present school for so long as he is eligible."

In May 2021, the trial court held a bench trial, and both parties presented evidence related to the parents' disagreements over N.W.C's education and travel and whether relocation to Oklahoma City would be in N.W.C.'s best interest. Afterward, the trial court filed a Rendition on Request for Modification, denying Mother's petition and granting in part and denying in part Father's counter-petition. Mother filed motions for reconsideration of the rendition and the trial court's exclusion of her expert witness's testimony at trial. The trial court denied her motions and, in July 2021, issued a final order. The order provided that Mother retained the exclusive right to designate N.W.C.'s primary residence so long as Mother resided in Dallas County and contiguous counties, except Ellis County; should Mother elect to reside outside of this geographic area, Father would have the

exclusive right to designate N.WC.'s residence within Dallas and contiguous counties; Mother and Father were to consult and agree on the school N.W.C. would attend following the 2021-2022 school year; and there must be written agreement regarding N.W.C.'s international travel. Finding that Mother's actions regarding the modification and relocation issues were deceptive and disingenuous, the trial court ordered her to pay $100,000 of Father's reasonable and necessary attorney's fees.

Mother subsequently requested, and the trial court issued, findings of fact and conclusions of law. This appeal followed.

**Modification of Residency Restriction**

In her first issue, Mother asserts the trial court abused its discretion in deciding not to lift the geographical residency restriction to allow Mother and N.W.C. to relocate to Oklahoma City. Specifically, Mother argues the trial court failed to properly balance the relevant factors set out in *Lenz v. Lenz*, 79 S.W.3d 10 (Tex. 2002), imposed an elevated burden of proof on Mother, and reached an arbitrary decision unsupported by the evidence.

A trial court may modify a conservatorship order if the movant proves by a preponderance of the evidence that (1) the modification would be in the best interest of the child, and (2) the circumstances of the child, a conservator, or other person affected by the order have materially and substantially changed since the date of the rendition of the prior order. *In re W.C.B.*, 337 S.W.3d 510, 514 (Tex. App.—Dallas 2011, no pet.) (citing TEX. FAM. CODE ANN. § 156.101); *Zeifman v. Michels*, 212

–4–

S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied). In this case, Mother challenges only the trial court's determination that lifting the geographical residency restriction was not in N.W.C.'s best interest.

The best interest of the child is always the primary consideration in issues of conservatorship. *W.C.B.*, 337 S.W.3d at 514 (citing FAM. § 156.101). Generally, courts have moved "from a relatively strict presumption against relocation and toward a more fluid balancing test that permits the trial court to take into account a greater number of relevant factors." *Lenz,* 79 S.W.3d at 14–15. There is "no bright-line test," however, because determining whether relocation is in a child's best interest is "intensely fact driven." *Id*. at 19.

When a primary custodial parent seeks to relocate, a court is guided by imperatives to:

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;

(2) provide a safe, stable, and nonviolent environment for the child; and

(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

*See id*. at 14 (citing FAM. § 153.001(a)). In *Lenz*, the supreme court also identified a number of factors that may help give meaning to the best-interest standard in the context of relocation. *Id*. at 15-16, 19. These factors include the reasons for and against the move; education, health, and leisure opportunities afforded by the move;

accommodation of the child's special needs or talents; the effect on extended family relationships; the effect on visitation and communication with the noncustodial parent; the noncustodial parent's ability to relocate; and the child's age.[1]  *Id*. at 15–16.

We review a trial court's decision to modify a conservatorship order for an abuse of discretion.  *W.C.B.*, 337 S.W.3d at 513; *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied).  Under this standard, we determine whether the trial court acted unreasonably; that is, did the court act in an arbitrary manner or without reference to any guiding rules or principles.  *W.C.B.*, 337 S.W.3d at 513.

Challenges to the sufficiency of the evidence supporting a parent-child relationship order are not independent grounds; instead, they are relevant factors in assessing whether the trial court abused its discretion.  *Id*.; *Zeifman*, 212 S.W.3d at 587–88.  To determine whether the trial court abused its discretion, we consider whether the trial court (1) had sufficient information on which to exercise its discretion, and (2) erred in exercising its discretion.  *Zeifman*, 212 S.W.3d at 588. We conduct the applicable sufficiency review under the first prong.  *Id.*  We then determine whether, based on the evidence, the trial court made a reasonable decision

---

[1]  The factfinder also may consider general factors relevant to the best interest of a child, including the child's desires; the child's current and future physical and emotional needs; any physical or emotional danger to the child in the present or future; the parental abilities of the individuals involved; the programs available to those individuals to promote the child's best interest; the plans for the child by these individuals; the stability of the home; acts or omissions by a parent tending to show that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent.  *In re Z.R.P.*, No. 05-12-00134-CV, 2013 WL 2157237, at *2 (Tex. App.—Dallas May 20, 2013, no pet.) (mem. op.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).

that was neither arbitrary nor unreasonable. *Id.* If some evidence of a substantial and probative character supports the trial court's decision, there is no abuse of discretion. *W.C.B.,* 337 S.W.3d at 513.

A trial court's written findings of fact and conclusions of law have the same dignity as a jury's verdict. *In re S.D.S.H.*, No. 05-15-00564-CV, 2016 WL 3398074, at *2 (Tex. App.—Dallas June 20, 2016, no pet.) (mem. op.). Findings of fact are subject to review under the same legal and factual sufficiency standards as jury findings. *Id.*

"[T]he trial court is in the best position to observe and assess the witnesses' demeanor and credibility and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re C.M.C.*, No. 05-15-01359-CV, 2016 WL 7166415, at *4 (Tex. App.—Dallas Nov. 9, 2016, no pet.) (mem. op.). Accordingly, we defer to the trial court's resolution of underlying facts and credibility determinations that may have affected its decision and do not substitute our judgment for the trial court's judgment. *Id.*

Here, Mother contends the trial court abused its discretion in determining that relocation to Oklahoma City was not in N.W.C.'s best interest. She first asserts the trial court's findings of fact indicate that the court imposed an elevated burden on Mother and, therefore, incorrectly weighed the evidence related to relocation. Specifically, Mother argues the following findings of fact reflect that the trial court

required her to establish certain factors relevant to whether relocation would be in N.W.C.'s best interest:

21. [Mother] failed to establish that relocation to Oklahoma City would improve her financial situation and ability to provide a better standard of living for [N.W.C.];

22. [Mother] failed to establish that any benefit that may inure to her based upon the move would outweigh the detriment or negative impact to [N.W.C.'s] future relationship with [Father];

23. [Mother] failed to establish that the move would not negatively impact [N.W.C's] existing relationship with [Father];

24. [Mother] failed to establish that relocation to Oklahoma City would improve the educational opportunities for [N.W.C.];

25. [Mother] failed to establish that [N.W.C.'s] relationship with and the presence of extended family and friends would be enhanced by the move;

26. [Mother] failed to establish that [N.W.C.'s] current relationships with extended family and friends would not be negatively impacted or damaged by the move;

27. [Mother] failed to establish that the move would not have a negative effect on [Father's] visitation and communication with [N.W.C.]; and

28. [Mother] failed to establish that [Father] has the ability to relocate to Oklahoma City, Oklahoma.

Mother had the burden to prove by a preponderance of the evidence that lifting the geographic residency restriction was in N.W.C.'s best interest. *See In re T.M.P.*, 417 S.W.3d 557, 562 (Tex. App.—El Paso 2013, no pet.). She did not have to establish that any particular factor weighed in favor of relocation. However, we

interpret the trial court's findings not to reflect an additional burden of proof on Mother, but to show that the court considered the factors and found that they did not weigh in favor of relocation.

Mother next argues that the trial court failed to give weight to factors favoring relocation, reached conclusions unsupported by Texas law on factors weighing against relocation, and improperly weighed irrelevant factors.[2] Mother further asserts that there is no evidence of a substantial and probative character to show that the trial court's order would advance the best interest of N.W.C.

The evidence at trial showed that, although claiming a primary residence in Dallas, Mother and N.W.C. spent as much time as possible in Oklahoma City following her July 2017 marriage to Stepfather.[3] Although Mother testified that they intended for Stepfather to relocate to Dallas, Stepfather did not request a relocation from his employer until the end of 2018. His request was denied. Stepfather's position as vice-president and general counsel for an Oklahoma holding company was unique, and he did not believe he could replicate his position and salary in Dallas or anywhere else.

---

[2] To the extent Mother complains about the trial court's findings that she considers irrelevant or the lack of findings favoring relocation, Mother has waived her complaint. A party that believes the trial court's findings of fact and conclusions of law are deficient in some way may request amended or additional findings and conclusions. *See* TEX. R. CIV. P. 298. If a party does not request amended or additional findings, it waives its right to complain on appeal about irrelevant or omitted findings. *See, e.g.*, *Villalpando v. Villalpando*, 480 S.W.3d 801, 809–10 (Tex. App.—Dallas 2015, no pet.); *Dallas Morning News Co. v. Board of Trustees of the Dallas Indep. Sch. Dist.*, 861 S.W.2d 532, 538 (Tex. App.—Dallas 1993, writ denied). Mother did not request additional or amended findings.

[3] Their residence in Dallas was the upstairs of Mother's parents' home, which Mother and Stepfather leased.

Mother tried to comply with the residency restriction in the divorce decree, but "her heart and life" were in Oklahoma with Stepfather. Mother, who was not employed, testified that Stepfather supported her financially and emotionally. It would be very difficult if she and N.W.C. could not relocate and live as an intact family with Stepfather. Stepfather testified that relocation would benefit Mother and, as a result, N.W.C. because of the very close bond he and Mother shared. Stepfather also testified, however, that he could commute between Oklahoma City and Dallas and would meet Mother's financial needs wherever she lived.

Father worked from home for a pharmaceutical company. Although he previously lived and worked in Oklahoma City, Father held a different position with responsibilities in Dallas, an important Texas client, and needed to live near DFW Airport to accommodate his work travel requirements.

Mother testified to a number of educational and fun activities that N.W.C. did in Oklahoma City. Stepfather and N.W.C. had a good relationship, and N.W.C. also built relationships with Stepfather's extended family, including a number of relatives in Sharon, which is a two-hour drive from Oklahoma City. Father testified to activities that he did with N.W.C. during his possession periods, including spending time with Father's extended family. Mother acknowledged that N.W.C. also could participate in the activities and lessons he enjoyed in Oklahoma City in Dallas. And, N.W.C. had close relationships with both his maternal and paternal grandparents, a number of other relatives, and Father's fiancé, all of whom lived in the Dallas area.

Mother and Father were unable to agree regarding N.W.C.'s education and, despite both parents stating that they wanted N.W.C. in school, he did not attend preschool. Ultimately, the trial court became involved and ordered that N.W.C. attend kindergarten at a private school in Dallas. Father, who met with N.W.C.'s teacher several times, testified that N.W.C. had a good kindergarten experience despite attending virtually. According to Mother, N.W.C. attended kindergarten virtually because Mother had autoimmune issues and was concerned about exposure to Covid-19. Mother, however, also testified to a number of activities that she and N.W.C. did in public places as well as several trips they made during the same time period. Father did not believe Mother put N.W.C.'s education first, noting occasions when N.W.C. attended school from the backseat of Mother's car on Thursdays when she was driving N.W.C. from Oklahoma City to Dallas for Father's possession periods. Mother, on the other hand, testified that Father did not keep up with N.W.C.'s school assignments during his Thursday night possessions.

The evidence showed that communication between Mother and Father had been poor. Although Mother told Father she was engaged, she did not tell him when she remarried because she did not think it was relevant. Instead, Father learned of the marriage in an email from Stepfather almost two months after the fact. And, despite Father's inquiries, it was not until Stepfather's relocation request was denied before Mother was forthcoming to Father about her and N.W.C. spending most of their time in Oklahoma City. Based on their history, Father did not have confidence

that their co-parenting relationship would allow them to work together on issues if Mother lived in Oklahoma City.

The evidence showed that Mother generally accommodated Father on the few occasions his work conflicted with a possession period. She also facilitated FaceTime visits for Father and N.W.C. However, Father feared that, if she and N.W.C. moved, it would be more difficult for his relationship with N.W.C. to continue.

Carrie Beaird, who served as parent facilitator, testified that both Mother and Father were engaged parents and really loved N.W.C., but they struggled to communicate and disagreed about what was in N.W.C.'s best interest. Beaird had concerns about Mother's tendency to make unilateral decisions about N.W.C. Beaird also had concerns about Mother's honesty and transparency in communicating about where she and N.W.C. were living. Discussions regarding N.W.C.'s education and activities became complicated because Mother and Father were living in different cities. Beaird explained that parents residing in the same geographic location, where they are able to work together more closely and both regularly attend activities, reduced pressure on the child.

Dr. Victoria Harvey, the child custody evaluator in this case, observed that both Father and Mother appeared to have a positive relationship with N.W.C. She also observed N.W.C. with extended family, finding his relationship with Father's family to be positive and with Mother's family to be good. N.W.C.'s relationship

with Stepfather also appeared positive, but Dr. Harvey did not believe it outweighed the social relationships available to N.W.C. in the Dallas area.

Dr. Harvey had concerns about N.W.C.'s socialization and ability to maintain attention; she believed he should attend school in person. His experience attending virtually, and even in the backseat of a car, was not in his best interest. Dr. Harvey also had a concern about N.W.C's speech and recommended an evaluation, but Mother disagreed that an evaluation was needed.

According to Dr. Harvey, Mother was a "parallel parent," which caused Dr. Harvey significant concerns about her ability and willingness to co-parent with Father. Dr. Harvey believed that Mother would exclude Father from N.W.C.'s life if she and N.W.C. relocated. Dr. Harvey also considered Mother a potentially restrictive gatekeeper, meaning that her attitudes, beliefs, and/or behavior were not supportive of N.W.C.'s relationship with Father. Observing inconsistencies in Mother's reporting, Dr. Harvey had concerns about Mother's pattern of not responding to Father's communications as well as providing evasive or insufficient responses. One example of this was Mother's lack of veracity regarding her intent to stay in Dallas while spending her time in Oklahoma City. Mother, however, did not see a problem with her pattern of not responding to Father's communications. If Mother and N.W.C. were to relocate, there would be a greater need for transparency and cooperation so Father could stay informed and involved and, based on their history, Dr. Harvey believed N.W.C.'s relationship with Father would suffer.

Ultimately, Dr. Harvey concluded that it was in N.W.C.'s best interest that he and both parents remain in the Dallas area. Dr. Harvey concluded that the costs associated with Mother and N.W.C. relocating greatly outweighed its potential benefits, especially in light of Mother's stated intention of living in the Dallas area should N.W.C. not be allowed to relocate. On cross-examination, Dr. Harvey acknowledged that her report was almost two-years old and a lot had happened since then. However, she believed her report was reliable and valid when she wrote it and stood by her recommendation.

Mother contends that the trial court's findings of fact indicate the court failed to give weight to or recognize factors and evidence in support of relocation, including Mother's quality of life and the positive effect it would have on N.W.C., the impact it would have on Mother's and N.W.C.'s financial, economic, health, and leisure opportunities, and the presence of extended family and friends in Oklahoma. To the contrary, the findings show the court considered these factors, but in weighing them, found evidence that any benefit that would inure to Mother did not outweigh the negative impact to N.W.C's relationship to Father.

Mother's desire to live as an intact family with Stepfather, who supported her and helped with N.W.C., was a valid reason weighing in favor of relocation. And, it is reasonable to infer that Mother's happiness would benefit N.W.C. But, the evidence also shows that Stepfather was prepared to commute and would support

Mother no matter where she lived.[4]  And, although there was evidence that N.W.C. had ample educational, health, and leisure opportunities in Oklahoma, Mother acknowledged that those same or similar opportunities were available to N.W.C. in the Dallas area.

The evidence showed that N.W.C. had close relationships with extended family in both the Dallas area and Oklahoma, and the trial court concluded that the presence of extended family did not weigh in favor of relocation.  Mother asserts there is no evidence that N.W.C. would be deprived of time spent with his Dallas area relatives if they relocated to Oklahoma City because Mother visits her family regularly and N.W.C. could see Father's family during his possession periods.  But, likewise, there is no evidence that N.W.C. would not be able to visit and maintain his relationships with Stepfather's extended family during Mother's possession periods.

The trial court heard substantial evidence of concern that, due to Mother's communication patterns and parenting methods, relocation posed a threat of continued problems between Mother and Father as well as to N.W.C.'s relationship

---

[4]   Citing *In re D.M.D.*, No. 05-07-01045-CV, 2009 WL 280465, at *4 (Tex. App.—Dallas Feb. 6, 2009, no pet.) (mem. op.), Mother asserts that the trial court's primary consideration should have been on the quality of life for N.W.C. and Mother, the custodial parent.  *See also Lenz*, 79 S.W.3d at 18 ("[b]ecause the custodial parent provides the child with a basic quality of life, a child's best interest is closely intertwined with the well-being of the custodial parent").  However, in *D.M.D.*, the record was "almost devoid" of evidence concerning what the child's life would be like if his mother abided by the residency restriction in order to maintain her right to designate his primary residence. 2009 WL 280465, at *4.  That is not true in this case.

with Father.  The parents' difficulty in communicating and working together was clearly important to the trial court's analysis and, along with other evidence, supported the court's findings that it was in N.W.C.'s best interest to remain in the Dallas area, an opinion shared by Dr. Harvey, a neutral professional who performed an extensive child custody evaluation.

As *Lenz* makes clear, there is "no bright-line test" for determining whether relocation is in a child's best interest.  *Lenz*, 79 S.W.3d at 14–15.  Here, the record indicates that the trial court heard evidence relevant to, and considered, the factors set out in *Lenz* and the imperatives of section 153.001(a).  Although Mother disagrees with the weight the trial court assigned to the evidence, the court had great latitude in determining the best interest of N.W.C.  *See T.M.P.*, 417 S.W.3d at 563, 566.  We must defer to the trial court's resolution of the underlying facts and credibility determinations, *id*., including the court's findings in this case that Mother was not a reliable source of information and her testimony was contrived.

After reviewing the evidence in light of the relevant factors for determining whether relocation is in a child's best interest, we conclude the trial court's findings of fact are supported by evidence of a substantial and probative character, as is the trial court's ultimate finding that relocation was not in the best interest of N.W.C.  We further conclude that the trial court's decision was neither unreasonable nor arbitrary.  Accordingly, we overrule Mother's first issue.

## Expert Witness Testimony

In her second issue, Mother contends the trial court abused its discretion by excluding the expert witness testimony of Dr. Jonathan Gould on rebuttal. Father's counsel objected to, and moved to strike, Dr. Gould's testimony as improper rebuttal testimony and for lack of foundation because Dr. Gould had not interviewed N.W.C. or any of the witnesses. The trial court sustained Father's objection.

Whether to admit or exclude evidence, including expert testimony, is within the trial court's discretion. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). We uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.5 (Tex. 1989).

Texas Family Code section 104.008 precludes a person from offering an expert opinion or recommendation relating to conservatorship of, possession of, or access to a child at issue in a suit unless that person has conducted a child custody evaluation under Family Code chapter 107. FAM. § 104.008. The excluded testimony need not be an opinion on custody; section 104.008 authorizes exclusion of testimony "relating to" the conservatorship of, possession of, or access to the child at issue. *See In re Gopalan*, No. 03-21-00209-CV, 2021 WL 2964263, at *2–3 (Tex. App.—Austin, July 15, 2021) (orig. proceeding) (mem. op.) (no abuse of discretion to exclude potential testimony of expert witness who did not perform custody

evaluation when witness's report criticized the scope of information considered by child custody evaluator and opined that evaluation had substantive problems).

In this case, Dr. Harvey was appointed as the child custody evaluator, and she undertook an evaluation meeting the requirements of Family Code chapter 107. Both parents consented to the evaluation, and, at trial, Dr. Harvey testified to her findings and recommendations.

Dr. Gould did not conduct a child custody evaluation, but Mother offered his testimony to critique Dr. Harvey's conservatorship opinion. Specifically, Dr. Gould sought to testify to Dr. Harvey's failure to look critically at certain factors, including parenting attributes, the educational and psychological needs of N.W.C., and the fit between those needs and what Mother and Father provided. Because the offered testimony clearly related to the conservatorship of, possession of, or access to N.W.C. and Dr. Gould did not conduct a child custody evaluation, we conclude the trial court did not abuse its discretion in excluding Dr. Gould's testimony at trial. *See, e.g.*, *id*.; FAM. § 104.008. We overrule Mother's second issue.

**International Travel Restriction**

In her third issue, Mother contends the trial court abused its discretion by imposing an international travel restriction that was not requested by either party, tried by consent, or in N.W.C.'s best interest. We disagree.

A judgment, absent issues tried by consent, must conform to the pleadings. *See* TEX. R. CIV. P. 301 ("The judgment of the court shall conform to the pleadings,

the nature of the case proved and the verdict, if any, and shall be so framed as to give the party all the relief to which he [or she] may be entitled either in law or equity."). *See also* FAM. § 102.008(b)(10) (requiring parties to include in their pleadings a "statement describing what action the court is requested to take concerning the child and the statutory grounds on which the request is made."). The purpose of pleadings is "to give fair notice of a party's claims and the relief sought." *James v. Comm'n for Lawyer Discipline*, 310 S.W.3d 598, 608 (Tex. App.—Dallas 2010, no pet.). Pleadings may be liberally construed to support the judgment. *Bos v. Smith*, 556 S.W.3d 293, 305–06 (Tex. 2018).

If issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated as if they had been raised by the pleadings. TEX. R. CIV. P. 67. To determine whether an issue was tried by consent, the trial court examines the record not for evidence of the issue, but rather for evidence of trial of the issue. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex. App.—Dallas 2005, pet. denied).

The divorce decree required that Mother and Father provide written notice if they intended for N.W.C. to travel internationally during their period of possession. Mother's live petition requested that the trial court enter a parenting plan consistent with her simultaneously-filed proposed parenting plan, which provided that Mother could designate a two-week possession period during the summer for N.W.C. to accompany her on Stepfather's international work trip. The proposed plan also

provided for Mother and Father to provide certain information when they planned to travel with N.W.C domestically by airline. The trial court's order, however, included a modified provision requiring that N.W.C.'s international travel be by written agreement. Although the trial court did not order the particular provisions Mother requested, we cannot conclude that Mother, who requested modification related to both domestic and international travel, lacked fair notice of trial on the issue.

Even if the issue were not raised by the pleading, we conclude it was tried by consent. There was considerable evidence at trial from witnesses for both Mother and Father about conflicts and poor communication regarding both international and domestic travel. There was testimony that Father traveled in-state with N.W.C. on one occasion without informing Mother. Stepfather testified to disagreement regarding whether a trip Mother and N.W.C. made to Italy in 2018 occurred during Father's weekend possessions. Father filed a motion for contempt during the trip, and, ultimately, a mediation was necessary to resolve make-up possession time for Father. Mother's counsel elicited Father's testimony about the incident. The trial court also questioned Father about the incident and both parties' "intellectual dishonesty relative to these issues," even commenting on the difficulty in entering an effective order. There was evidence that Mother tended not to communicate, or communicate only minimally, in general and with respect to travel information. According to Dr. Harvey, Mother did not seem to understand how she could have

handled communications about the trip to Italy any differently. Dr. Harvey also had a general concern about Mother planning things, like the trip, and then seeking permission. On this record, it is apparent that there was trial by consent on modification to the divorce decree's international travel provisions.

Mother also contends that the record does not show the international travel restriction was in N.W.C.'s best interest.[5] Specifically, Mother argues there is no case law to support an international travel restriction based on "communication challenges." Citing *Messier v. Messier*, 389 S.W.3d 904, 910 (Tex. App.—Houston [14th Dist.] 2012, no pet.), Mother notes that such a restriction has been deemed required only where the safety of the child was at issue or where there was a risk of international abduction. In *Messier*, the trial court, although finding no credible evidence of risk of abduction, determined that limiting the mother's control over the children's international travel was in the children's best interest when there was evidence of "irrational and threatening behavior" by the mother. 389 S.W.3d at 908–11.

A trial court may impose restrictions to a conservator's rights with respect to a child so long as the restrictions are necessary, and not excessive, to protecting the

---

[5] Mother asserts that the international travel restriction is not supported by the trial court's findings of fact, but she did not file a motion requesting additional or amended findings of fact. Accordingly, we presume the court impliedly made findings, supported by the record, necessary to support its order. *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 258 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *see also* TEX. R. CIV. P. 299; *Collins v. Walker*, 341 S.W.3d 570, 574 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (losing party may request additional findings on omitted elements to prevent them from being deemed on appeal).

best interest of the child. *Messier*, 389 S.W.3d at 910 (citing FAM. § 153.072). A trial court had broad discretion in determining a child's best interest, *see id*. at 909, and we are aware of no authority requiring a court to find a risk to a child's safety before imposing a requirement that parents agree to the child's travel.

The trial court was in the best position to observe the witnesses' demeanor and personalities and understand influences on family dynamic that cannot be discerned simply by reference to the record. *Id*. at 909-10. We conclude there is some evidence of a substantive and probative character to support the trial court's decision to require each parent to obtain written permission for international travel. The trial court reasonably could have found that requiring Mother and Father to communicate well in advance about both the timing of international travel and any related changes to possessory periods was necessary, but not excessive, to protect N.W.C.'s best interest. Accordingly, we conclude the trial court did not abuse its discretion in imposing the restriction on international travel. We overrule Mother's third issue.

We affirm the trial court's order in the suit to modify the parent-child relationship.

/Craig Smith/

CRAIG SMITH

210882F.P05                                    JUSTICE

–22–



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

IN THE INTEREST OF N.W.C., A
MINOR CHILD

No. 05-21-00882-CV     V.

On Appeal from the 330th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DF-16-01933.
Opinion delivered by Justice Smith.
Justices Pedersen, III, and Goldstein
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee recover his costs of this appeal from appellant.

Judgment entered this 23rd day of January, 2023.